# EXHIBIT 1



**Notice of Service of Process**

**TMM / ALL**
**Transmittal Number: 17473079**
**Date Processed: 12/05/2017**

| | |
|---|---|
| **Primary Contact:** | Kate Inman<br>OPKO, Inc.<br>4400 Biscayne Blvd<br>Ste 900<br>Miami, FL 33137 |

| | |
|---|---|
| **Entity:** | OPKO Health, Inc.<br>Entity ID Number  2206585 |
| **Entity Served:** | Opko Health, Inc. |
| **Title of Action:** | Lee Michael Pederson vs. Phillip Frost |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Other |
| **Court/Agency:** | Hennepin County District Court, Minnesota |
| **Case/Reference No:** | Not Shown |
| **Jurisdiction Served:** | Delaware |
| **Date Served on CSC:** | 12/04/2017 |
| **Answer or Appearance Due:** | 20 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Lee Michael Pederson<br>952-836-7949 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

State of Minnesota
Hennepin County

District Court
4th Judicial District
Court file no. _____
Case type: Civil

---

Plaintiff Lee Michael Pederson ("Plaintiff" or "Pederson"),

 for the first cause of action against Phillip Frost ("Frost"), Opko Health, Inc. ("Opko" or "OPK"), Brian Keller ("Keller"), and CoCrystal Pharma, Inc. ("Cocrystal" or "COCP"), plus Does 1-50 (collectively the "Fraud Defendants"),

 for the second cause of action against Phillip Frost, Opko, and Keller plus Does 1-50 (collectively the "Tortious Interference Defendants").

---

## SUMMONS

THE STATE OF MINNESOTA TO DEFENDANT OPKO HEALTH, INC.:

You are hereby summoned and required to serve upon Plaintiff or his Attorney an answer to

the complaint which is herewith served upon you within twenty (20) days after service of this

summons upon you, exclusive of the day of service. If you fail to do so judgment by default will

be taken against you for the relief demanded in the complaint.


Rule 114 of the Minnesota General Rules of Practice provides for use of alternative dispute

resolution ("ADR") in most cases. Notice of ADR processes will be provided by the Court

Administrator after this action is filed.

Plaintiff's Signature _____

Print Name   Lee Michael Pederson
       pro se
Address     2126 Lyndale Ave S #6
City/State/Zip  Minneapolis, MN 55405
Telephone   952-836-7949
Email     LeeMPete@aol.com
MN Atty. No.  225605

State of Minnesota                           District Court
Hennepin County                              4th Judicial District
                                             Court file no. _____
                                             Case type: Civil

---

Plaintiff Lee Michael Pederson ("Plaintiff" or "Pederson"),

 for the first cause of action against Phillip Frost ("Frost'), Opko Health, Inc. ("Opko" or "OPK"), Brian Keller ("Keller"), and CoCrystal Pharma, Inc. ("Cocrystal" or "COCP"), plus Does 1-50 (collectively the "Fraud Defendants"),

 for the second cause of action against Phillip Frost, Opko, and Keller plus Does 1-50 (collectively the "Tortious Interference Defendants")

 states and alleges as follows:

---

## COMPLAINT

Jury trial demanded

## NATURE OF THIS ACTION

1. According to the FBI website,

> [White collar crimes] "are not victimless crimes. A single scam can destroy a company, devastate families by wiping out their life savings, or cost investors billions of dollars (or even all three). Today's fraud schemes are more sophisticated than ever ..." (www.fbi.gov/investigate/white-collar-crime as of March 5, 2017)

2. This lawsuit involves a sophisticated fraud scheme that has destroyed a company, devastated families, and cost investors tens of millions of dollars.

3. Defendant Frost is the head of a white collar gang that specializes in securities fraud. Frost and his co-conspirators and accomplices are referred to herein as the "Frost gang."

4. This lawsuit arises from a complex and ongoing pump and dump (P&D) securities fraud orchestrated by the Frost gang. Plaintiff was associated with a company called BioZone when he was among many others who were cheated by the defendants, so the frauds of the Frost gang related to BioZone are referred to herein collectively as "FrostZone."

1

5. Members and associates of the Frost gang have made tens of millions of dollars in illegal profits during the course of FrostZone.

6. Appendix 1 shows a flow chart of individuals and entities involved in FrostZone (001). Appendix 2 shows the FrostZone time line (002). Because of the complexity of the case, it may enhance the reader's comprehension to have hard copies of these exhibits available for reference while reading this complaint.

7. In this document, the name "BioZone" is meant to refer to any of the entities that retained plaintiff to handle patent and other intellectual property ("IP") issues for QuSomes and related technologies beginning in about 2000, as well as the legal successors to the liabilities for the bad acts that form the basis of this lawsuit. Currently, defendant Cocrystal is the successor entity to BioZone for these liabilities. "BZNE" is a subset of the term "BioZone" and refers specifically to the public company that traded under that ticker symbol from 2011 until the ticker was changed to COCP in early 2014.

8. Besides FrostZone, the Frost gang has also conducted P&D frauds at other companies.

9. The Frost gang P&D method typically comprises the following steps, though they have used many variations on the theme:

-Gang members gain control of a private company, usually in the fields of biotechnology, computers, or mining.

-The private company is taken public with a reverse merger transaction in which the Frost gang controls the shell company.

-The resulting public corporation has the following characteristics:  Frost gang insiders and collaborators at the company own the vast majority of shares; they acquired these shares for next

to nothing; the shell company was thinly traded prior to the reverse merger, and there has been almost no public float.

-The gang pushes a registration statement through the SEC, allowing holders (Frost gang insiders) of previously restricted shares to sell their cheap or free shares on the open market.

-The Frost gang fabricates and disseminates a "story" to hype the stock to naïve retail investors (the "pump"). The story includes references to Frost being an "investor" in the company, even though he has not added much if anything to the corporate treasury and has acquired his shares at prices far below those paid by non-Frost gang insiders.

-After the pump, trading volume of the stock jumps dramatically, allowing Frost gang insiders to illegally profit from selling their cheap shares (the "dump").

-Eventually the stock price of the company collapses because the pump story created a temporary and illusory high share value, and also because the stock structure of the company has been designed for a P&D fraud and not for a profitable operating company.

10. Defendant Phillip Frost participated in fraudulent schemes that harmed plaintiff and plaintiff's clients.

11. Plaintiff brings this present action to recover damages suffered as a result of defendants' frauds and tortious interference during FrostZone.


JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over this action.

13. This Court has personal jurisdiction over the foreign defendants because they have consented to personal jurisdiction in the State of Minnesota, because they have availed themselves of the protections of Minnesota law, because they have purposely directed their

3

relevant conduct toward and within the State of Minnesota and/or because they have sufficient minimum contacts with the state of Minnesota.

14. Venue is proper in this Court.

## PARTIES

15. Plaintiff Lee Pederson is an individual resident of Hennepin County at 2126 Lyndale Ave S #6, Minneapolis, MN 55405.

16. Defendant Phillip Frost is an individual resident of Palm Beach County, at 21 Star Island Drive, Miami Beach, Florida 33139. Frost is a major shareholder, Chairman, and CEO of Opko Health, Inc.

17. Defendant Opko Health, Inc. is a publically traded Delaware corporation with its principal place of business at 4400 Biscayne Blvd, Miami, FL 33137.

18. Defendant Brian Keller is an individual resident of Contra Costa County at 5058 Nortonville Way Antioch, California 94531. Keller was an officer and director of BZNE.

19. Defendant CoCrystal Pharma, Inc. (COCP) is the legal successor to BZNE. COCP is a Delaware corporation with its principal place of business at 1860 Montreal Rd, Tucker, GA.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

20. This section of the complaint has been organized into the following subsections:

(a) Introduction (page 6)

(b) The fraudulent takeover of BioZone by the Frost gang (page 7)

(c) The BioZone Registration Statement (page 14)

(d) BioZone after the reverse merger, the Wu Technology, and the Kilo Lab (page 14)

4

(e) The firing of Dan Fisher (page 18)

(f) The Fisher shares and the Wu shares (page 19)

(g) The looting of BioZone's assets (page 19)

(h) The fraudulent transfer of rights to propofol formulations (page 21)

(i) Pederson's resignation from BioZone (page 26)

(j) Pederson's monitoring of BZNE after resignation (page 27)

(k) The first Fisher litigation with the Frost gang (page 29)

(l) The September 27, 2013 pump and dump fraud (page 30)

(m) Specific details of the pump and dump (page 33)

(n) MusclePharm's role in the pump and dump (page 42)

(o) The fraudulent manufacturing asset sale to MusclePharm (page 46)

(p) The BZNE/Cocrystal Discovery, Inc. merger (page 47)

(q) Continued pumping at COCP and the role of Roger Kornberg (page 48)

(r) Phillip Frost memes - the "retail buyer" meme (page 49)

(s) Phillip Frost memes - the "technology lure" meme (page 50)

(t) Pederson's resignation from the California bar (page 51)

(u) Investigating FrostZone with Dan Fisher (page 53)

(v) RICO (page 54)

(w) Summary (page 54)

(x) Damages (page 55)

Claims begin at page 56

Appendixes:

Exhibit 1 – FrostZone flow chart (page 64)

Exhibit 2 – FrostZone time line (page 65)

Introduction

21. Plaintiff Pederson is a United States patent attorney, and is a member of the Minnesota Bar.

Pederson holds a bachelor's degree in biology from the University of Minnesota, a master's

degree in cell and molecular biology from San Francisco State University, and a J.D. degree

from William Mitchell College of Law. Pederson has additionally studied computer science at

California State University Hayward, and business through University of California Santa Cruz

extension. He has worked in research and/or R&D since about 1985, including technology

development for the Human Genome Project at Lawrence Livermore National Laboratory,

Huntington's Disease research at the University of British Columbia, and pharmaceutical

development of the anti-cancer drug Doxil® at Sequus Pharmaceuticals, Inc. Pederson has

substantial experience in patent law, the pharmaceutical industry and drug delivery technology.

22. Plaintiff Pederson first met defendant Keller and non-party Daniel Fisher in about 1999.

Fisher and Keller were co-founders of BioZone. Pederson initially wrote a patent application for

BioZone, and then continued to do work for BioZone. From 1999 to about May of 2007,

Pederson's work for BioZone was done through a series of law firms with which Pederson was

associated.

23. In about May of 2007 BioZone directly engaged plaintiff Pederson as a patent attorney,

when Pederson was working as a sole practitioner out of a Minnesota office. Pederson continued

representing BioZone while working out of his Minnesota office until withdrawing from

representation of BioZone in June of 2012.

24. At one time Pederson had a close and trusting work relationship with Keller.

6

25. Much of Pederson's early work with BioZone involved a drug delivery technology called QuSomes®.

26. In about 2007 Keller and BioZone began a scientific collaboration with Dr. Nian Wu, a chemist working at Sloan Kettering Cancer Center in New Your City.  Pederson drafted a number of patent applications naming Wu and Keller as inventors.  The patent applications were generally directed at new drug delivery technologies (the "Wu Technology") that extended the QuSome technolgy.  During this time Pederson and Wu developed a close working relationship.

27. While Pederson was working on the Wu Technology, Keller made repeated oral promises and representations to Pederson that, once outside funding became available, BioZone would give Pederson cash bonuses, stock options, and greatly increased amounts of work and/or an in-house position.

28. Until 2011, Pederson charged BioZone $175 per hour for working on the Wu technology, a rate about half of what BioZone would typically have had to pay a patent attorney of comparable training, skill and experience.  In early 2011, Pederson raised his hourly rate to $240.

29. By late 2010, the Wu Technology was sufficiently developed so that BioZone could seek funding for drug development activities.


The Fraudulent Takeover of BioZone by the Frost gang

30. In January 2011 BioZone entered into a Binding Letter of Intent ("LOI")(006) with The Frost Goup, comprising defendant Frost, Michael Brauser and Barry Honig.  The LOI memorialized The Frost Group's supposed intent to invest in BioZone in support of BioZone's R&D programs focused on drug delivery.

31. Keller organized a series of meetings in Miami in Febuary 2011 with the purported

investors, including defendant Frost. Among those attending the meetings were plaintiff,

defendants Frost and Keller, and non-parties Elliot Maza, Roberto Prego-Novo (004), Harvey

Kesner, Barry Honig, Michael Brauser, Jane Hsiao, Nian Wu, Fisher and Christian Oertle.

During these meetings, Frost and others agreed to invest millions of dollars in BioZone to fund

drug development activities. (007)

32. The meetings were held in the conference room outside Frost's office at Frost's IVAX

building in Miami (005).

33. On the first day of the Miami meeting, Pederson briefly met Barry Honig and Michael

Brauser in a group setting. They were introduced as the "money men" – the guys who would put

the financings together for BioZone. Their offices were in the IVAX building.

34. At the time of the 2011 Miami meetings BioZone was a private company with a healthy cash

flow, less than $2 million in debt, over a hundred employees, and a need for several million

dollars in operating capital to pursue pharmaceutical development activities. BioZone and its

related entities (excluding BetaZone), were entirely owned by four individuals: Keller, Fisher,

Wu and Oertle, with Oertle holding a relatively small ownership share.

35. The BioZone team at the Miami meetings consisted of owners Fisher, Keller, Wu and Oertle

and patent attorney Pederson (plaintiff).

36. At the time of the 2011 Miami meetings BioZone had three core assets. The first asset was a

manufacturing business with about $15 M of yearly revenues. The much more valuable second

and third assets were a broad technology platform for drug delivery including QuSomes® and

the Wu Technology. Both QuSomes and the Wu Technology were technically applicable to two

lines of business: OTC (over-the-counter) and prescription medications. The first generation

8

QuSome technology was invented by Danilo Lasic (now deceased) and Keller. A next generation QuSome technology was invented primarily by non-party Nian Wu along with Keller (the "Wu Technology"), and included several potential blockbuster drug candidates.

37. The meetings produced an agreement that Frost and his associates would provide initial funding of eight million dollars to BioZone in exchange for an ownership stake, and that initial funding would be leveraged into a public offering. The total amount of the initial funding and the public offering was projected to be about $15 M. The proceeds would be intended to develop and commercialize the Wu Technology. Terms were agreed upon and documents were signed. These initial promises of the Frost gang turned out to be the first part of an enormous multi-faceted fraud (006, 007).

38. Once the Frost gang agreed to fund BioZone, Maza was added to the BioZone team by Frost et al. (008).

39. The Frost gang never delivered the promised funding. Instead they looted BioZone's assets and set the company up for a P&D that began in about September of 2013. The P&D resulted in tens of millions of dollars in illegal profits for the Frost gang and their associates. (009)

40. Frost's primary occupation was and is serving as CEO of defendant Opko Health, Inc.. Frost holds a significant percentage of the shares in OPK, a public traded company with a market capitalization of about $3.8 billion as of October 14, 2017.

41. In addition to promising funding for BioZone at the Miami meetings, Frost was keen on obtaining rights to the QuSome technology for ophthalmic uses. Soon after the Miami meetings, in March and April of 2011 Pederson was asked by Keller (who was an officer of BioZone) to work with an Opko attorney to prepare a technology license from BioZone to Opko for use of QuSomes in the field of opthamology (the "Opthalmic License"). Pederson had previously

9

worked on many technology license deals for BioZone. However, the draft Opthalmic Licenses that Pederson saw all had a fundamental problem - they were essentially bald licenses from BioZone to Opko without adequate consideration to BioZone as would normally be included in an arm's length transaction. Pederson repeatedly raised this issue with Keller, suggesting that an investment by Opko in BioZone would be appropriate consideration for the technology license. However, Pederson's suggestions were ignored. When some time passed and Pederson hadn't heard about any progress on the license, Pederson asked Keller what was happening. Keller told Pederson that the license deal had been put on hold.

42. After signing a Binding Letter of Intent in 2011, Frost and his gang took control of BioZone using fraudulent means without the knowledge of Pederson, as follows.

43. Up to this point of a signed agreement with the Frost gang, Fisher had always maintained complete control of BioZone's documents and finances. With a false trust in the Frost gang, control was turned over to members of the Frost gang, primarily Frost puppet Maza. However, Fisher was given an illusion of overall control because he was named as a corporate officer and he and Keller made up two thirds of the board of directors when BioZone became publicly traded BioZone Pharmaceuticals, Inc. (BZNE) via a reverse merger with a shell owned by Frost gang members. This was just another part of the fraud.

44. After privately held BioZone became publicly traded BZNE, things immediately got nasty for Fisher. His long-time business partner Keller double-crossed him and colluded with the Frost gang. The Frost gang fabricated false accusations against Fisher (207). Fisher was marginalized and excluded from operations, decision-making and access to information. Keller was named CEO, and now with a board composed of Fisher, Keller, and Frost gang member Roberto Prego-

Novo as chairman, the Frost gang had complete control over BZNE and Fisher was left powerless. The company he had worked 20 years to build had been stolen from under his nose.

45. Patent attorney Pederson had worked with Fisher and Keller on BioZone issues since about 2000. The motives of the Frost gang were not apparent to Pederson in 2011 and Pederson continued to represent BZNE as an attorney, primarily in the areas of patents and licensing. Meanwhile, BZNE's corporate misdeeds were hidden from Pederson. Keller, who Pederson still trusted at the time, kept reassuring Pederson that the promised funding from Frost would soon be delivered. Keller rationalized the marginalization of Fisher to Pederson by saying that Fisher wanted to retire anyway, and that he would be a happy camper when the funding came in, the share price rose to $5, and Fisher's six million shares would be worth over $30 million. Pederson believed Keller's story at the time.

46. The promised funding never came through, but the Frost gang kept using it as a ruse while they were pursuing their real goals, including a P&D securities fraud.

47. Despite Keller being named the CEO, Elliot Maza controlled all the finances and day-to-day operations. Maza was in close communication with Frost, and he carried out Frost's plan to the detriment of BZNE. Along with Keller, Maza manipulated Dr. Wu and Pederson to gain greater control over BZNE's intellectual property rights for the benefit of Frost and OPK. Maza degraded BZNE's manufacturing business, including firing employees and not pursuing new business. As a result, BZNE's revenues declined drastically. Maza intentionally ruined BZNE's line of credit so that a new holder for BZNE's short-term debt had to be found. The replacement for the line of credit was a loan from Frost/OPK. Maza refused to pay creditors. He turned BZNE around from a profitable business to a business with huge and unsustainable operating losses. When he became aware of some of the frauds in 2012, Pederson initially believed that

11

Maza was intentionally steering BZNE into bankruptcy so that Frost/OPK would get all the intellectual property.

48. Fisher filed a whistleblower complaint with the SEC in December of 2011, while he was still an officer and director at BZNE. (010) After filing his SEC whistleblower complaint, Mr. Fisher was told by two members of the Frost gang (Honig and Brauser) that they were going to fire him. Fisher told them that they couldn't legally fire him, because he had filed a whistleblower complaint. The Frost gang members told Fisher that they had connections within the SEC, and they weren't worried about it. In early February of 2012, BZNE directors Keller and Prego-Novo voted to fire Fisher from his executive position. Maza signed a termination letter effective January 30, 2012. (139) Fisher subsequently resigned from the board. (136) Maza took Fisher's place on the board of directors, and then Maza replaced Keller as CEO. Keller and Maza lied to Pederson about all of this in order to continue to use Pederson's services.

49. There is a picture of the original BZNE "team" taken in Miami in January 2011. (008) Fisher, Keller and Christian Oertle had flown in from California. Nian Wu had flown in from New Jersey. Pederson came in from Minnesota. Elliot Maza was the representative of the Frost-led "investor" group. In the picture the "team" was smiling in the Florida sunshine. The day before, they had all been in the conference room outside Frost's office when Frost gave his word that Frost's group of "investors" would provide initial private funding and then obtain following public funding totaling about $15 million for BioZone.

50. The key steps in the fraudulent takeover of BLG by the Frost Group are outlined as follows.

51. Frost gang member Brauser, on behalf of the Frost gang, signed a binding Letter of Intent (LOI) to invest $8 million in BioZone for to provide operating capital for R&D activities. The LOI with an amendment were completed in early 2011. This promise of investment capital was

the essence of the deal for fraud victims Dan Fisher and Nian Wu. The $8 million was to be raised by Private Investment in Public Entity (PIPE) funding, and to be followed by a public offering of BZNE shares for additional funding. (231)

52. As a result of the LOI and in reliance on the Frost Group living up to the deal, Fisher allowed the Frost gang to take effective control over BioZone.

53. Attorney/Frost gang member Michael Harris "represented" BioZone early in the transition from a private to public company, which involved a reverse merger with a public shell company called International Surf Resorts (ISR). ISR was owned and controlled by Frost gang members and their associates

54. Part of the transition involved an Asset Purchase Agreement (APA) with a Frost gang private company called Aero. (001) BZNE received Aero's "assets" and the owners of Aero received BZNE stock. The APA required BZNE to file a Registration Statement (RS) with the SEC for the benefit of the owners of Aero.

55. Instead of seeking performance on the LOI from his fellow Frost gang members, once Maza had control of BioZone Maza filed a RS for the benefit of existing owners of BZNE with no proceeds going to the company. (012) The RS covered the shares issued to the former owners of Aero, including members of the Frost gang. Frost owned 3.8 million of these shares. Prego-Novo owned 1.9 million of these shares. Steven Rubin owned 530,000 of these shares, of which he acquired 500,000 by providing strategic consulting services. (013)

56. The RS was eventually approved by the SEC just prior to a pump and dump fraud (P&D) that began in September of 2013.

57. The Frost gang never performed on the LOI while Maza looted BZNE's assets. BZNE remained undercapitalized until its demise.

13

58. The Frost gang took a "so sue me" attitude towards Fisher and other victims with the intention of wearing them down via civil litigation.


THE BZNE Registration Statement

59. BZNE originally filed Registration Statement 333-176951 on September 21, 2011. (012) Several aspects regarding the Registration are staggeringly astounding in their disregard for BZNE's best interests. Yet, these same aspects are completely in line with other frauds typical of the Frost gang.

60. Page 2 of amendment no. 1 to Form S-1 (dated December 19, 2011) of the Registration Statement indicates the intention to register 8,345,310 shares of BZNE for a public offering.

61. Page 3 of amendment no. 1 to Form S-1 of the Registration Statement states that,

"We [BZNE] will not receive any proceeds from the sale of these shares by the selling shareholder."

62. Page 7 says that,

"This prospectus relates to the sale by a single selling stockholder of 8,345,310 shares of our restricted common stock, issued pursuant to an Asset Purchase Agreement dated as of May 16, 2011 by and among the Company, Baker Cummings Corp. and Aero Pharmaceuticals, Inc."

63. The document was apparently prepared by Elliot Maza and Harvey Kesner.

64. During a period where the Frost gang's promise to the BioZone owners was to raise operating capital by a public offering, this 139 page document (including attachments) was totally at odds with that promise.


BZNE after the reverse merger, the Wu Technology and the Kilo Lab

65. BZNE became completely dysfunctional after the reverse merger. On the one hand, Wu, Fisher and Pederson were trying to move the company forward according to a long agreed-upon plan. On the other hand, the Frost gang was planning a P&D, and they had no intention of following through on their promises. Keller double-crossed his colleagues and colluded with the Frost gang.

66. Once Maza got control of the finances and records, the Frost gang acted in unison to make Fisher's position unbearable. With Keller now siding with Prego-Novo on the Board, with Fisher excluded from corporate operations, and with Frost et al failing to follow through with their financial promises, Fisher was forced out. (014)

67. For some time, Keller apparently served as CEO. However, once Fisher was out completely, Maza took over as CEO.

68. Nian Wu relied on the Frost gang's promises and made a start to growing BZNE's research and development program, as was anticipated by the Binding Letter of Intent. Wu leased lab space and hired several Ph.D. level scientists. This became a problem almost right away because Maza refused to provide money for these operations. Wu got to the point of having to pay for them from his own credit card. (015)

69. As part of the reorganization of privately-held BioZone to publicly-traded BZNE, BioZone's auditors requested that Pederson write a letter concerning the status of BioZone's intellectual property. This was normal procedure, especially since Keller and Maza indicated to Pederson that a public offering of stock was planned.

70. Pederson advised Maza of BioZone's unresolved IP issues, and suggested a course of action. Pederson offered to coordinate this effort, which in Pederson's opinion and experience was an essential part of BioZone's ability to meet disclosure requirements for a planned public stock

offering. Maza told Pederson that Maza would take care of it. In fact, (as per Keller's later statements to Pederson) Maza did not address this issue in any positive manner at all.

71. Plaintiff had a close working relationship with Wu (inventor of the Wu Technology) starting from about 2008, and prepared many patent applications related to the Wu Technology.

72. Before the Miami meetings of 2011, the exact amount of Wu's ownership stake of BioZone and its related entities was not agreed upon between the four owners (Fisher, Keller, Wu and Oertle). Prior to the meetings and without Wu's consent, Keller represented to Frost et al that Wu's ownership share was significantly less that Keller's and Fisher's. This caused considerable friction between Keller and Wu. Because of Pederson's close relationship with Wu, Keller asked Pederson to smooth things over. After a series of phones calls and emails between Pederson and Wu, and between Pederson and Keller, the issue was resolved by Wu receiving equal shares with Keller and Fisher.

73. Though many Wu Technology patent applications had been filed, formal assignments of the applications had not been made and the applications were being prosecuted under the names of inventors Wu and Keller as of early 2011.

74. As part BioZone becoming a public company, Wu was promised funding to start a research facility called the "Kilo Lab" to further develop the Wu Technology. By June of 2011, no such funding had been provided by the Frost gang, and Wu began to grow suspicious. Wu had not formally assigned his patent rights at this time. Frost and Maza insisted on such assignment, with a repeated promise of funding if Wu executed an assignment. Because of previous broken promises and misrepresentations by Keller and Maza, Wu did not completely trust Keller or Maza. Wu remained reluctant to sign, and it appeared that the whole deal might fall apart. At that point Keller told Pederson, "You are the only person Nian (Wu) trusts right now." On one

16

day's notice Plaintiff was flown to New Jersey, where he met with Wu, Keller and Maza and

helped convince Wu to sign an agreement (the "First Wu License") which assigned rights for the

Wu Technolgy (except for a portion of the Wu technology called the "Sugar Lipid Technology")

to BZNE. After Wu signed the agreement, some temporary funding was provided for the Kilo

Lab, but the promised eight million dollars was not provided to BZNE by Frost et al.

75.   In late 2011, with consent and waiver of potential conflicts by BZNE, Wu engaged Plaintiff

to prosecute patents for the Sugar Lipid Technology on behalf of Wu.

76.   Also in late 2011, Maza was engaged in preparing financial projections, an investor

presentation, and title clearance for the Wu Technology (purportedly for the benefit of BZNE,

but actually for the benefit of Opko). Plaintiff Pederson participated to a small extent in such

preparations. When an issue arose between Wu and Maza regarding the scientific accuracy of

the investor presentation, Pederson deferred to Maza as the representative of BZNE for the

matters at hand. This matter is further described below.

77.   Unbeknown to Pederson at the time, Maza then alienated and antagonized Wu and

completely stopped providing funding for the Kilo Lab.

78.   Apparently believing that Plaintiff Pederson was in league with Maza, Wu lost trust in

Pederson and terminated Plaintiff's services for patent prosecution of the Sugar Lipid

Technology in early January of 2012. Wu did not pay Pederson for his services or for out-of-

pocket costs advanced on behalf of Wu.

79.   Keller assured Pederson that funding for BZNE and the Kilo Lab was still forthcoming from

the Frost gang, and that the relationship between Pederson and Wu would be smoothed over after

funding was provided.

80. Based on Pederson's long-term relationship with Keller, Pederson believed Keller. However, unbeknown to Pederson, Keller and Maza were lying to Pederson and withholding crucial information about many aspects of the frauds that were in progress.

81. In reliance on Keller's false assertions and to smooth things over with Wu, with Keller's approval Pederson zeroed out his bill to Wu for the time spent on the Sugar Lipid patent application (208). Pederson also zeroed out the filing fee he had advanced for the Sugar Lipid application. (209) Keller assured Pederson that Pederson would be compensated for his time and expenses when the funding came through.

82. In contrast to privately-held BioZone's financial condition at the beginning of 2011, public BZNE's annual report (SEC Form 10-K) for 2011 disclosed over $7.2 million in liabilities - a $2.2 increase from the previous year. Instead of investing in an equity stake in BZNE by purchasing shares and thereby contributing operating capital as promised, Frost et al took control of the company by fraudulent means in which their only financial "contribution" was convertible notes, i.e., a new loan to substitute for an existing loan that BioZone already had in place. These convertible notes not only bore interest, they also allowed Frost gang members to convert them to shares at extremely favorable prices.


The Firing of Dan Fisher

83. While Fisher was both a director and officer at BZNE, Fisher objected to Maza's illegal methods and actions.

84. When he could not resolve the matters internally, Fisher filed an SEC whistleblower complaint with the SEC on December 9, 2011 (010).

85. Maza was aware of Fisher's whistleblower complaint (017).

86. Maza, acting as BZNE's CEO and in concert with the BZNE board of directors and defendant Frost terminated Fisher's executive position at BZNE effective on January 30, 2012 (139).

87. During the time of Fisher's firing, BZNE attorney Lee Pederson was in almost daily contact with Brian Keller. (210, 211, 212) Pederson had known and worked with both Keller and Fisher for over ten years at the time. Keller lied to Pederson about the firing, by telling Pederson that Fisher had resigned from his position as a corporate officer, but that Fisher remained as a director of BZNE. In fact, Fisher was fired from his officer position and resigned from his director position.

The Fisher shares and the Wu shares

88. As part of the transition from privately held BioZone to publicly traded BZNE, Fisher, Wu and Keller were each supposed to receive over 6 million shares of the new public company. The Frost gang never delivered the shares to Fisher and Wu. After getting fired, Fisher reported what had happened to him to the FBI. The FBI then provided Fisher with a "victim's letter" saying that Fisher was the victim of possible securities fraud, and that the FBI had opened an investigation. (018)

89. Wu never received his promised shares.

90. Keller, who participated in the Frost gang's frauds, received at least some of the shares promised to him. (232)

The looting of BZNE's assets by the Frost gang

91. There is another photograph relevant to this case, this one taken in New Jersey in July of 2011. (016) The Frost gang had not delivered on the initial private funding, and because of that Nian Wu had not executed formal assignments of his patent rights to BZNE. In fact, Wu distrusted both Keller and Maza by this time because of misrepresentations they had made to him. Pederson was flown to New Jersey to help close a deal between BZNE and Wu, with assurances from Keller to Pederson that the private funding would be forthcoming after Wu signed. Keller and Maza needed Pederson to fly to New Jersey for a four-person two-hour meeting because Pederson was (as Keller put it) "the only one Nian trusts right now." Outside of the tantrum Maza threw in the car on the way over and the gratuitous lie he told Wu during the meeting, there was a cordial two-hour meeting over Korean barbeque. Pederson took a picture at the end of the meeting. Keller and Wu are both smiling and shaking hands over a signed license agreement, while Maza is off to the side in the foreground, sending a text to Frost announcing that Wu had been manipulated into signing away some of his rights for another illusory promise. Of course, the long-promised funding from the Frost Group did not materialize after Wu signed the agreement.

92. BZNE had three main lines of businesses: (1) contract manufacturing, (2) development of prescription pharmaceutical formulations based on QuSomes and the Wu Technology, and (3) development of QuSomes and the Wu Technology as a drug delivery platform for over-the-counter drugs. The Frost gang was not interested in developing any of these business for the benefit of open market purchasers of BZNE shares or the original owners of BioZone. Instead, their intent was to exploit these businesses for the benefit of Frost gang insiders, including illegally profiting from a P&D fraud. Then to cover up the P&D, they would then do another reverse merger. (001) In practice, Maza implemented the Frost gang's strategies as follows:

93. Maza failed to enforce the Binding Letter of Intent.

94. Maza ignored and undermined BioZone's drug development businesses because they required a long term commitment and significant cash investment. The drug development businesses were the primary reasons that BioZone had sought outside investors, but they were incompatible with the Frost gang's goals of profiting by fraud and deception.

95. Maza fraudulently transferred rights to drug formulations from BZNE to Frost's company OPK.

96. Maza degraded BZNE's manufacturing business by failing to pursue new opportunities, laying off long term workers, and destroying relationships by failing to pay obligations. As a result, BioZones revenues decreased dramatically while its debts increased.

97. Maza failed to take steps required for a promised public offering of BZNE shares.

98. While acting as BZNE's CEO in 2012, Maza collected over $500,000 in cash compensative (202) while fraudulently transferring corporate assets, intentionally destroying a business that took 20 years to build, and firing hourly employees. In 2013, Maza's cash compensation from BZNE exceeded $370,000 (203). Maza also received millions of shares of BZNE stock.


The fraudulent transfer of rights to BZNE's propofol formulations to OPK

99. In late February of 2012 after Fisher had been fired, Maza fraudulently transferred BZNE intellectual property rights to OPK in a deal that included rights to a potential billion dollar a year pharmaceutical product. During the year 2011, Dr. Nian Wu had made significant advances in developing new formulations of the drug propofol (the drug from which Michael Jackson overdosed and died). Because Wu did not trust the Frost gang, he independently sought patent

protections for his new inventions and these new inventions were excluded from his July 2011 patent assignment agreement with BZNE.

100. At the same time, Wu was frustrated by continuing misrepresentation from Maza and Keller regarding funding for his research. By now, Keller had completely thrown in his lot with the Frost gang, and was actively deceiving and double-crossing his long-term colleagues Wu and Pederson. Since Wu and Pederson did not know this at the time, it caused tensions and miscommunications between them. However, based on the continuing fraudulent promises that funding from the Frost gang would materialize, Wu and Pederson tried to move forward in a completely dysfunctional environment.

101. Pederson was not in the habit of initiating contact with Fisher or Keller unless it was related to a specific matter he had been asked to work on. Further, Keller misled Pederson about Fisher's situation at BZNE. In late 2011, Wu was in regular contact with Pederson about his own unhappy situation at BZNE, and Keller was coaching (and lying to) Pederson about how to maintain Wu's support for BZNE. At some point, Wu informed Pederson that Fisher had filed a whistleblower complaint with the SEC. When Pederson asked Keller about it, Keller said that Fisher was just unhappy about his diminished role in the company and that Fisher wanted to retire anyway, and that he would be a happy camper when the funding came in, the share price rose to $5, and Fisher's six million shares would be worth over $30 million. Pederson believed Keller's story at the time. At the same time, Pederson was working with Wu on his inventions that Wu had kept separate from BZNE.

102. Also at the same time, Keller and Maza were working on an investor presentation with the purported purpose of selling shares of BZNE to raise capital. Pederson was asked to review various editions of the presentation. When doing such a review, Pederson noticed that the

presentation was using information from Wu's separate inventions (the "sugar lipid" technology) in a misleading manner that made it appear that BZNE owned Wu's inventions. (206) Pederson informed Maza and Keller of this so that they could remove the misleading material from the presentation, and Maza told Pederson that Maza would handle it. Pederson does not know what happened between Wu and Maza in this regard, but soon thereafter Wu terminated his personal use of Pederson's services.

103. The investor presentation projected that BZNE/Wu's propofol formulation would be a billion dollar drug within a few years.

104. The presentation included a profitability analysis for a formulation of the generic drug propofol using the Wu Technology. The analysis projected a potential $1.2 billion dollar per year profit for such a formulation. Frost was aware of this projection. Instead of providing the promised investment capital in BZNE, he directed his Keller, Maza and Prego-Novo to transfer rights to the propofol formulation to Opko, his own company, in February of 2012. (020)

105. In late January of 2012, Maza sought Pederson's assistance with preparing another written agreement with Wu (the "Second Wu License"), again on the pretext that such agreement was required before the promised funding would materialize. The Second Wu License was to include a license for the Sugar Lipid technology for delivering propofol, a potential billion dollar per year pharmaceutical product. Keller backed up the Maza story to Pederson. Pederson then assisted with drafting the Second Wu License.

106. During preparation of the Second Wu License, on February 19, 2012 Pederson was in his office in Minnesota when Maza and Frost called Pederson from Miami to request information from that Pederson, which disclosure would violate Pederson's confidentiality with Wu regarding the Sugar Lipid Technology. It was an apparent attempt to gain leverage in negotiations with

23

Wu. Pederson refused to provide the information, and was thereafter shut out of communication regarding the Second Wu License. (021, 022)

107. Shortly thereafter, and without any knowledge by Pederson, BZNE (through the actions of Maza, Keller and Prego-Novo) licensed the Wu Technology to Opko for grossly inadequate consideration. The license was announced to the public via a press release from Opko on February 27, 2012. (023)

108. The license to Opko was completely contrary to BioZone's long-standing business plan, and completely contrary to the interest of BZNE shareholders Wu and Fisher.

109. By now, BioZone was in a precarious financial position with very little cash on hand. "We're not paying anyone [any creditors]," was the way Keller expressed it to Pederson. At the same time, Keller kept telling Pederson that the promised funding from the Frost gang would come through at any time.

110. Maza and Keller were officers and directors of BZNE at the time of the fraudulent transfer of BZNE's assets to Opko. Prego-Novo was Chairman of BZNE. Their transfer of BZNE's assets to Opko for grossly inadequate consideration violated their duties as officers and directors of a publicly traded corporation. Instead of acting as fiduciaries for BZNE, they were acting as factotums for Frost.

111. In late February, OPK announced that they had obtained rights to a potential billion dollar a year propofol formulation from BZNE. (023) Pederson had no advance notice of this fraudulent deal.

112. When Pederson asked Maza about the deal, Pederson asked if BZNE had received enough cash in the deal to pay its bills and fund Wu's research. Maza said no. Pederson then asked Maza why he would do such a bad deal or BZNE in his role as CEO. Maza replied that he didn't

have any choice or leverage. From the context it was clear to Pederson that Maza had done the deal for personal reasons, and not at all in BZNE's best interests.

113. Then Pederson talked to Keller about the deal. "This is fraud," Pederson told Keller. "Dan [Fisher] is going to sue. Nian [Wu] is going to sue." Keller's reply was, "Dan's not going to sue. He doesn't have any money. And Jane [Hsaio] is negotiating with Nian." Keller's immediate comments on this topic gave Pederson the impression that the Frost gang had anticipated possible litigation with Fisher and/or Wu, and that dealing with Fisher and Wu after the fraudulent asset transfer was already a part of the Frost gang's strategy.

114. Over the next few days, Pederson and Keller had many phone conversations in which Keller kept lying to Pederson and misrepresenting his own (Keller's) role in the fraud.

115. After conversations with Keller and Maza, on March 18, Pederson sent an email demanding from Maza and Keller a business rationale for the license to Opko. (024) Of course, no such rational was forthcoming because the license to Opko was directly contrary to the business interests of BZNE.

116. At that point, Pederson was convinced that a fraud had been committed. On March 28, 2012 Pederson first documented the fraud in writing in an email to Keller. (025) In a series of phone calls with Keller, Pederson advised Keller on possible ways to undo the fraud. However, Keller continued to mislead and withhold information from Pederson.

117. Specifically, believing that Fisher was still on the BZNE Board (as per Keller's representations), Pederson advised Keller to mend fences with Fisher and undo the fraud by a vote of BZNE's Board. Keller did not even admit to Pederson that Fisher was no longer on the Board during this conversation.

Pederson's resignation from BZNE

118.  Several things were clear to Pederson immediately after the fraudulent propofol rights

transfer to Opko occurred:  (1) A fraud against Fisher and Wu had occurred; (2)  Maza had

signed away BZNE's rights to its most important asset for grossly inadequate consideration;  (3)

BZNE did not have any money to support Wu's research;  (4) there was only a remote chance

that the fraud would be undone, and (5) without Pederson's knowledge of the fraud, his services

had been used in carrying out certain aspects of the frauds that harmed Fisher and Wu.

Therefore, Pederson felt he had no other choice but to resign as counsel for BZNE.  Pederson

gave notice so that BZNE would have adequate time to find a new patent attorney.  (026)

119.  After Pederson submitted his resignation, but before his representation of BZNE ended,

Pederson wrote a detailed memo  (the "first fraud memo") outlining the fraud by defendant Frost

against Wu and Fisher.  On May 11, 2012 he provided the first fraud memo to Keller, at the same

time informing Keller that the memo would also be provided to Prego-Novo, BZNE's chairman.

(027a, 027b)  After several discussions with Keller, Pederson redacted one sentence from the

draft before sending the revised memo (the "second fraud memo") to Prego-Novo on May 16,

2012.  (Exhibit 028a, 028b 028c)  The redacted sentence had to do with Maza's frequent temper

tantrums.  Specifically, the one redacted sentence was, "Brian has told me that such tantrums are

an almost everyday occurrence for Elliot."  While admitting the fraud, Keller explained to

Pederson, "I still have to work with Elliot [Maza], and I don't want to antagonize him."  Pederson

subsequently completely withdrew from representing BZNE.

120.  In the email to Prego-Novo that accompanied the second fraud memo, Pederson urged that

the fraudulent transfer of propofol rights be undone, and that the Frost gang provide the promised

funding so that BZNE's research and development programs could continue. (Exhibit 028c)

Prego-Novo did not respond to Pederson, or even acknowledge receipt of the email and memo.

121. Separately, Dr. Nian Wu severed his relationships with BZNE because of the fraudulent

license to OPK and the lack of funding. (015) The blatant fraudulent transfer of rights to the

propofol formulations to OPK had begun to open both Pederson's and Wu's eyes to many of the

other frauds that had been occurring at BZNE.

122. At the time Pederson withdrew from representation of BZNE, he had not been involved in

preparing, reading or monitoring BZNE's SEC filings and had no inkling of the securities fraud

yet to come.


Pederson's monitoring of BZNE after resignation from BZNE

123. Though Pederson had provided plenty of advance notice for BZNE to find a new patent

attorney, he had not received any information on the new attorney by the last week of May 2012.

Pederson then called Keller and requested instructions as to where to send the BZNE patent files.

Keller said that they had not yet retained a new attorney. Pederson asked why not. Keller

replied that he was hoping that Pederson would continue to represent BZNE. Pederson said that

wasn't going to happened, and asked if he should simply send the files to the company. Keller

said to wait a day or so, and they would identify an attorney.

124. Once Keller identified a new patent attorney for BZNE, Pederson shipped the new attorney

BZNE's files in both electronic and paper formats. (029, 030)

125. For many months after Pederson stopped representing BZNE, Pederson continued to get

notices from the patent office and foreign associates regarding BZNE's cases. In a normal

course of business, the new attorney would file change of correspondence addresses with the

patent office and associates. However, BZNE apparently did not pay the new attorneys, so they did not officially take over the cases and the correspondence continued to go to Pederson. The correspondence Pederson received indicated that BZNE was allowing most, if not all, their patents and patent applications to go abandoned. Pederson forwarded this correspondence to Keller with repeated requests that the correspondence addresses be changed. (031)

126. Pederson billed BZNE for this extra work, but was never paid. (032, 033)

127. As a member of the California bar, Pederson faced prohibitions against telling Wu what Pederson know about the frauds committed against Wu by the Frost gang.

128. Though Fisher was no longer on the Board of BZNE at the time of Pederson's resignation, Keller had represented to Pederson that Fisher had retained his Board seat. Even though Pederson was made aware that Fisher was no longer a corporate officer, Pederson did not learn that Maza replaced Fisher on the Board until after June of 2012, and then only by reviewing BZNE's SEC filings.

129. Since Pederson was under the impression that Fisher was still on the BOD, Pederson considered sending the second fraud memo to Fisher. However, Pederson still had some slight hope that the fraud might be reversed and the funding would be provided. He thought that those chances would be better if he didn't send the fraud memo to Fisher, so he didn't. Shortly thereafter, Pederson learned from SEC filings (038) that Fisher was no longer on the BOD. (039)

130. After withdrawing from representation of BZNE, Pederson monitored developments at BZNE via publically available information, mainly SEC filings and other information available on the internet. His intent was to understand what was happening and to rectify the consequences of the fraud to the extent he could.

131. Also from reviewing SEC filings, Pederson learned something of BZNE's stock structure.

132. From internet searching, Pederson learned more about Frost gang members, including

Barry Honig and Michael Brauser, and their previous business dealings and litigations.

133. From internet searching, on about November 1, 2012 Pederson learned that Fisher had sued

BioZone et al. Publicly available court filings from this lawsuit provided Pederson further

insights into FrostZone. (014)

134. Though the information was limited, Pederson began to assemble a set of knowledge that

would be helpful in later deciphering what the Frost gang did in the pump and dump phase of

FrostZone, as well as other Frost gang pump and dumps.

135. On April 11, 2013 Pederson sent Keller et al a demand letter to rectify the fraud. (063)   At

the same time, Pederson sent an invoice in the amount of $6,457.50 for legal services and

expenses that Pederson was forced to provide after withdrawing from representation. (063b)

The invoice was never paid and there was no response to the demand letter.


The Fisher litigation with the Frost gang

136. On July 16, 2012, Fisher filed suit in federal court in California against BioZone et al. The

suit was settled on September 5, 2013, with Fisher receiving a monetary payment. However,

Fisher's legal fees alone were hundreds of thousands of dollars, and the case did not even reach

the point where Fisher could obtain any significant discovery from the defendants. The first

Fisher litigation is a prime example of how the Frost gang backs up its "agree with me or sue

me" philosophy.

137. Even though the first litigation settled, additional litigation between Fisher and COCP and

others has continued.

The September 2013 BZNE pump and dump fraud

138.  The P&D began almost immediately after the Fisher settlement.  Many members of the

Frost gang conspired to commit this fraud.  The following facts illustrate the case.

139.  There was never a public offering of BZNE shares.  Almost all existing shares were

initially issued to insiders.

140.  The insiders who obtained shares paid little or nothing.

141.  Until late September of 2013, BZNE shares were thinly traded.

142.  On September 26, a writer named John Ford posted an article about BZNE on a website

called Seeking Alpha.  (034)  The article was based on an interview with BZNE officer and

director Brian Keller.  The article contained materially misleading information related to

BioZone's product development activities, finances and strategic direction.

143.  Ford had written numerous other articles pumping Frost gang companies, including:

- September 19, 2013:  "Pershing Gold:  Near-Term Catalyst Could Provide 50% Upside"

- March 27, 2013:  "MusclePharm Hits a Home Run"

- January 28, 2013:  "Opko's Billionaire CEO Invests in MusclePharm"

- Wednesday, December 19, 2012:  "Why MusclePharm Could Go From $4 to $20"

- October 3, 2012:  "Opko's 4KScore Could Generate Over $1.8 Billion Annually"

- September 14, 2012:  Near-Term Catalyst Could Drive ChromaDex Shares Higher"

- August 6, 2012:  Vringo Prevails Over AOL, Google Could be Next"

- July 25, 2012:  "Vringo's Stout Trumps 13 Tech Giants in NTP Patent Suit"

- July 23, 2012:  "Vringo Settlement Could Drive Vringo Shares Above $30"

145. In early September of 2013, message boards were created on Yahoo!Finance and investorshub.com to pump BioZone shares. (040) The first posting on the BZNE message board at Yahoo! Finance was dated September 2, 2013 - less than four weeks before trading in the pump and dump scheme began. The BZNE message board at Investors' Hub was created on September 5, 2013.

146. Between July 10, 2013 and September 26, 2013, daily trading volume of BZNE only exceeded 20,000 shares on a few days. On many days during this time period, less than 1,000 shares were traded. During this time period BZNE traded between $ 0.40 and $ 0.70 per share.

147. On September 27, trading volume of BZNE soared to over 4.5 million shares. Almost all of the shares originally available for trading were those held by BZNE insiders.

148. Between September 27 and October 21, 2013 (17 trading days), over 50 million shares (over 70% of outstanding shares, or over 4% per day) of BZNE were traded at prices above the acquisition prices of the Fisher Stock and the Frost and Opko Warrants.

149. On October 4, BZNE filed a Form 144 with the SEC disclosing that defendant Frost intended to sell 1,995,500 shares of BZNE on approximately October 1, 2013 at an aggregate market value of $1,177,345 ($ 0.59 per share). This Form 144 further disclosed the securities to be sold included shares derived from 159,267 shares acquired on February 22, 2011 for cash, 1,433,403 shares acquired on March 14, 2011 as a stock dividend, and 4,957,823 shares acquired on May 16, 2011 for private stock in an Asset Exchange Agreement (035).

150. On October 8, BZNE filed a Form 144 with the SEC disclosing that defendant Opko intended to sell 701,000 shares of BZNE on approximately October 8, 2013 for an aggregate market value of $ 350,500 ($ 0.50 per share). This Form 144 further disclosed the securities to

be sold included shares derived from 7,650,000 shares acquired on July 3, 2012 in a cashless

exercise of a warrant conversion. (036)

151.  On October 17, 2013, BZNE filed a Form 8-K with the SEC disclosing that,

> "From October 7 through October 9, 2013, BioZone Pharmaceuticals, Inc. issued
> 4,080,943 shares of common stock to seven noteholders upon conversion of notes at
> $ 0.20 per share.  (037)

152.  Insiders including defendants Frost and Opko profited from shares they sold as part of the

pump and dump.

153.  The pump and dump was coupled with transactions with MusclePharm Corporation

("MSLP") to issue and sell shares of both companies in a fraudulent manner, as detailed below.

154.  The Frost gang engineered the pump and dump fraud involving BZNE to work like this:

•       Frost et al fraudulently took control of BioZone.

•       Frost installed his accomplices Elliot Maza and Roberto-Prego Novo on the BZNE board

of directors and installed Maza as puppet CEO.

•       BZNE issued tens of millions of shares to Frost, OPK and other insiders at little or no

cost to the insiders.

•       BZNE arranged for the dissemination of a materially misleading internet article on

September 26, 2013.  The article was misleading in terms of BZNE's drug development activities

(the "pipeline"), BZNE's strategic direction, and BZNE's finances, and it was largely based on an

interview with BZNE officer and director Brian Keller.

•       Trading in BZNE went from almost nothing before September 26 to over 4.5 million

shares on September 27.

•       Volume and price of BZNE shares may have been manipulated by illegal swap trades and

paid pumping on internet message boards.

•     Insiders, including Frost and OPK, unloaded shares at artificially inflated prices.

The September 2013 BZNE Pump and Dump Fraud - Specific Details

155. Until early 2011, BioZone Laboratories, Inc. existed as a privately held California corporation, with ownership rights in other related entities.

156. On February 18, 2011, the corporate precursor to BioZone filed a 10-K under its name of International Surf Resorts, Inc. (041)

157. On March 1, 2011 a Form 8-K was filed disclosing the issuance by International Surf Resorts of secured convertible promissory notes and warrants to accredited investors for the sum of $2.25 million dollars. (042)

158. On Mar 4, 2011, Form 8-K's were filed changing the corporate name of International Surf Resorts, Inc. to BioZone Pharmaceuticals, Inc. ("BZNE") and disclosing the purchase of BioZone Laboratories, Inc. and its related entities by BZNE. (043)

159. From about May 16, 2011 until its merger with CoCrystal Discovery, BZNE operated as a publically traded corporation.

160. Since about May 16, 2011, BZNE/COCP consistently produced net losses according to documents filed with the SEC.

161. Daniel Fisher was a co-founder and co-owner of the original BioZone Laboratories, Inc.

162. Fisher parted ways with BioZone after BioZone became a publically traded company.

163. Fisher filed a lawsuit in Federal District Court against BioZone, Frost, and other entities (Civil Action No. C 12-03716 WHA, United States District Court, Northern District of California, San Francisco Division).

164. Fisher had earlier filed a related SEC whistleblower complaint on December 8, 2011. (010)

165. The actual trading in the pump and dump scheme did not begin until about September 27, 2013, until after the first Fisher litigation was settled.

166. Frost et al received notes from BZNE during various financial operations from 2011 to 2013 that typically included a conversion feature for BZNE stock at a price of $0.20 per share or thereabouts. (044)

167. Frost et al received warrants from BioZone during various financial operations from 2011 to 2013 for purchase of BZNE stock at a price of $0.40 per share or thereabouts. (044)

168. On August 30, 2013, BZNE filed a Form 8-K with the SEC disclosing that BZNE had entered into a Securities Purchase Agreement with MusclePharm Corporation of Denver, Colorado ("MusclePharm"). This agreement indicated that Harvey Kesner represented MusclePharm. (045) Kesner previously and/or concurrently also represented Frost.

169. The Securities Purchase Agreement referred to above was described in a Market Wired press release published on September 3, 2013:

> "MusclePharm Corporation (OTCQB: MSLP) ("MusclePharm" or "the Company"), a fast growing company that develops and markets sports nutritional supplements which address active lifestyles, announced today it has made a $2 million strategic investment in BioZone Pharmaceuticals, Inc." The article went on to say, "MusclePharm's $2 million investment in BioZone was made in the form of a 10% secured convertible note due one year from the date of issuance. The note is convertible into shares of BioZone common stock at $.20 per share. MusclePharm also received a 10-year warrant to purchase 10,000,000 shares of BioZone's common stock at an exercise price of 0.40 per share." (046)

170. The MSLP Securities Purchase Agreement was another component of the pump and dump. BZNE got cash, MSLP got cheap shares to profit from, and open market investors bought the BZNE shares at inflated prices. MSLP did temporarily give $2 million in cash to BZNE, but they got the entire amount plus a substantial profit back in a short time frame when they sold the shares on the open market.

171. The MSLP/BZNE Securities Purchase Agreement was not an arm's length transaction.

172. The later MSLP/BZNE Asset Purchase Agreement described below was not an arm's length transaction either, and adequate due diligence, valuation, and asset shopping was not done by either party.

173. Fisher settled his civil lawsuit against BZNE and Frost et al. in September of 2013. According to an 8-K filed by BZNE on September 11, 2013, Fisher's settlement of his civil case included the sale of over 6 million shares of BZNE (the "Fisher Stock"). (213) Many of these shares were purchased for about $ 0.15 per share by Frost and/or associates of Frost.

174. On September 10, 2013, an article entitled "Why BioZone Pharmaceuticals, Inc. Could Be The Next Big Name In Drug Administration Technology" was posted on the internet. (047) This blog by Samuel J. Rae touted BZNE's affiliation with Frost. The blog also lauded BZNE's "improving financials" by citing an increase in annual sales from fiscal year 2011 to fiscal year 2012. The blog ignored the fact that BZNE's most recently filed 10-Q, dated August 15, 2013, showed a 60% sales decline for the preceding three month year-over-year period, a 52% sales decline for the preceding six month year-over-year period, a 72% gross profit decline for the preceding three month year-over-year period, and a 67% gross profit decline for the preceding six month year-over-year period.

175. On September 26, 2013, an article entitled "Opko and its Billionaire CEO Invested in Biozone" was posted on the internet. (101) This blog by John H. Ford stated that, "Opko (OPK) and Dr. Phillip Frost have taken a 25% position in BioZone." The blog also said "BioZone's initial 3 drug targets are large, with total addressable markets exceeding $7 billion annually." The blog contained a section titled "BioZone's balance sheet" which said. "I have

calculated BioZone's current cash position... This leaves BioZone with approximately $1,904,000 in cash." (034)

176. The statements and analysis in the Ford blog regarding the potential for revenues from BZNE's "drug targets" were inconsistent with the company's significantly declining R&D expenditures disclosed in their 10-Q's: $19,831 for R& D in the 3 months ending March 30, 2013, compared with $221,614 for the same period of the previous year (greater than 90% decline in R&D expenditures); $5,845 for the 3 months ending June 30, 2013, compared with $206,502 in 2012; and $55,390 for the 3 months ending September 30, 2013, compared with $155,941 in 2012. (048)

177. The statements and analysis in the Ford blog regarding BZNE's balance sheet and cash position disregarded liabilities of $1,461,930 (accounts payable) and $3,705,375 (accrued expenses and other current liabilities) reported in the BZNE 10-Q filed on August 15, 2013. (048)

178. Here is an exchange between Ford and Keller quoted in the article:

"Q [JF]: Do you want to talk about any other product candidates?
[BK] There is an oral antifungal, Posaconazole (Noxafil®) which has a broad antifungal spectrum, and a great safety profile, but patients can only take it orally so they don't get enough concentration to kill the fungus. If an injectable form could be brought to market, which we believe we can do, we could probably capture a large percentage of the $4 billion injectable antifungal market.
Q [JF]: What makes you think you can develop an injectable version of Posaconazole?
[BK] We have already developed a formulation. We know that the drug is perfectly dissolved by the QuSomes."

179. The above is a classic example of Frost gang deception. BZNE did not have an active posaconazole research program (101). And, as time would tell, BZNE had no intention of developing a posaconazole formulation.

180. John H. Ford had previously blogged about companies associated with the Frost gang, including:

- September 19, 2013: "Pershing Gold: Near-Term Catalyst Could Provide 50% Upside"

- March 27, 2013: "MusclePharm Hits a Home Run"

- January 28, 2013: "Opko's Billionaire CEO Invests in MusclePharm"

- Wednesday, December 19, 2012: "Why MusclePharm Could Go From $4 to $20"

- October 3, 2012: "Opko's 4KScore Could Generate Over $1.8 Billion Annually"

- September 14, 2012: Near-Term Catalyst Could Drive ChromaDex Shares Higher"

- August 6, 2012: Vringo Prevails Over AOL, Google Could be Next"

- July 25, 2012: "Vringo's Stout Trumps 13 Tech Giants in NTP Patent Suit"

- July 23, 2012: "Vringo Settlement Could Drive Vringo Shares Above $30"

181. Between September 26, 2013 and October 18, 2013, there were at least 12 additional blogs about BZNE posted on the internet. Many of these blogs discussed the connection between Frost to BZNE.

182. On July 10, 2013, BZNE shares had traded as low as $ 0.16 per share.

183. Between July 10, 2013 and September 26, 2013, daily trading volume of BZNE only exceeded 20,000 shares on a few days. On many days during this time period, less than 1,000 shares were traded. During this time period BZNE traded between $ 0.40 and $ 0.70 per share.

184. On September 27, 2013, the day after the Ford article appeared, 4.5 million shares of BZNE were traded.

185. Between September 27 and October 21, 2013 (17 trading days), over 50 million shares (over 70% of outstanding shares, or over 4% per day) of BZNE were traded at prices above the acquisition prices of the Fisher Stock, BZNE stock purchased by warrants, and BZNE stock

obtained by conversion of notes. During this time period BZNE traded between $ 0.45 and $ 0.97 per share.

186. On October 4, 2013, BZNE filed a Form 144 with the SEC disclosing that Frost intended to sell 1,995,500 shares of BZNE on approximately October 1, 2013 at an aggregate market value of $1,177,345 ($ 0.59 per share). This Form 144 further disclosed the Securities to be sold included shares derived from 159,267 shares acquired on February 22, 2011 for cash, 1,433,403 shares acquired on March 14, 2011 as a stock dividend, and 4,957,823 shares acquired on May 16, 2011 for private stock in an Asset Exchange Agreement. (035)

187. On October 8, 2013, BZNE filed a Form 144 with the SEC disclosing that Opko Health, Inc., whose CEO is Frost, intended to sell 701,000 shares of BZNE on approximately October 8, 2013 at an aggregate market value of $ 350,500 ($0.50 per share). This Form 144 further disclosed the Securities to be sold included shares derived from 7,650,000 shares acquired on July 3, 2012 in a cashless exercise of a warrant conversion. (036)

188. On October 10, 2013, an author named Rick Pearson published an article about BZNE on the internet. (050) The Pearson article contains this paragraph:

> "The stock also saw some weakness due to a misread of two recent sec filings. Frost and Opko recently registered some of the previously acquired stock on form 144. This is a totally standard process, but some investors have clearly misread the filings and believe that Frost has actually sold shares of Biozone. This is not the case. There has been no sale whatsoever; filing on form 144 does not even indicate the intention to sell."

189. According to the SEC website:

> "A person filing a Form 144 must have a bona fide intention to sell the securities referred to in the Form within a reasonable time after the filing of the Form."

190. Pearson's statement is directly at odds with the SEC position.

191. On October 17, 2013, BZNE filed a Form 8-K with the SEC disclosing that,

"From October 7 through October 9, 2013, Biozone Pharmaceuticals, Inc. issued 4,080,943 shares of common stock to seven noteholders upon conversion of notes at $ 0.20 per share. (037)

192. On November 13, 2013, MusclePharm (ticker symbol: MSLP) announced that,

"today it has signed a definitive asset purchase agreement with BioZone Pharmaceuticals, Inc. ... to acquire substantially all the assets of BioZone and its subsidiaries." (051)

193. According to page 6 of BZNE's SEC Form 10-Q dated November 18, 2013, BZNE

commented on the MusclePharm transaction as follows:

"Upon closing, the Company [BZNE] will have a material stock ownership of MusclePharm Corporation ("MSLP"), cash, expects to have no liabilities and only one employee of the Company." (052)

194. MusclePharm purchased the BZNE assets with 1.2 million shares of MusclePharm stock.

MSLP shares closed trading on November 13 at $9.22, giving an effective book value of BZNE

of $11,064,000. On that same day, BZNE shares closed at $0.64. With over 70M shares

outstanding on that date, BZNE's market capitalization was over $44,800,000 - four times the

sale value agreed to in the deal with MSLP.

195. The sale value agreed to in the MSLP deal apparently valued BZNE shares below 16 cents.

196. In a press release dated November 27, 2013,

"Biozone Pharmaceuticals, Inc. (OTCBB: BZNE) today announced that it has agreed to terms and signed a Letter of Intent to merge with Cocrystal Discovery, Inc., a privately-held, biotechnology company..." (053)

197. The November 27, 2013 press release went on to say, "Cocrystal Discovery has previously

received strategic investments from Teva Pharmaceuticals (NYSE: TEVA), Opko Health

(NYSE: OPK), and The Frost Group. Opko Health and The Frost Group together own

approximately 40% of Cocrystal Discovery."

198. Frost was also a large investor in MusclePharm.

199. Frost's intent was to disperse the assets and dissolve the entity of BZNE by transactions with companies that he controls or influences in an effort to cover up the pump and dump scheme.

200. The actions described above constitute one or more violations of SEC Rule 10b-5. Under subsections (a), (b) and/or (c) schemes, devices and artifices to defraud / untrue statement of material fact / practice ... which operate ... as a fraud might include: misrepresentations regarding financial performance; misrepresentations regarding potential "drug targets"; misrepresentations regarding corporate strategy; manipulation of stock price; manipulation of stock volume and the misuse of Frost's reputation to pump the stock for Frost's benefit; .

201. In announcing BZNE's merger with Cocrystal Discovery, Inc. (Cocrystal) on about November 27, 2013, it was reported that the new company would be 40% owned by existing BZNE shareholders and 60% owned by Cocrystal shareholders. At the time, BZNE had about 75 million shares of common stock outstanding.

202. On December 26, 2013, BZNE filed an 8-K reporting the issuance of about 12.9 million shares of common stock as a result of the conversion of notes for about 10 to 20 cents per share. (054)

203. On January 3, 2014, BZNE announced that "it has finalized its planned merger with Cocrystal Discovery, Inc." Concurrent with the merger, the three existing directors (Prego-Novo, Maza and Keller) resigned. They were replaced by a completely new board, including Frost and Roger Kornberg, founder of Cocrystal Discovery, Inc. Similarly, the entire BZNE management team was replaced. (055)

204. As a result of the CoCrystal merger, the BZNE ticker symbol changed to COCP and Cocrystal became the legal successor to BZNE.

40

205. On January 6, 2014, MusclePharm (MSLP) announced that "it has completed the acquisition of essentially all the assets" of BZNE. (056)

206. BZNE filed an 8-K on January 8, 2014 reporting that the owners of Cocrystal were being issued 1 million shares of preferred BZNE stock. Each share of the preferred stock was convertible to about 205 shares of BZNE common stock. (057)

207. As a result of all these transactions, COCP now had the equivalent of over 350 million shares of common stock outstanding.

208. In the Ford blog of September 26, 2013, BZNE's value proposition was explained to be based mainly on the story that BZNE had the potential to develop and sell its own branded pharmaceutical products (the "drug targets") using its QuSome technology. This value proposition was supported by a long detailed interview with Brian Keller. At the time, Keller was an officer and director of BZNE, though Keller was only referred to in the article as BZNE's Chief Scientific Officer. (101)

209. On November 13, 2013 (less than two months after the Ford blog appeared), it was announced that BZNE had sold its QuSome technology to MSLP.

210. As detailed below, outside of blogs, the primary sources of investor information for potential open market purchasers of BZNE shares during the first phase of the pump and dump had been online message boards at Yahoo!Finance and Investors Hub.

211. On the online message boards after the announcement of the MSLP deal, BZNE's value proposition transformed to become almost completely based on the premise that BZNE was associated with Frost and therefore BZNE was a good investment.

212. After BZNE became COCP, the narrative changed again.

213. Inter-corporate asset transactions solely involving companies owned and/or controlled by Frost (BZNE, MSLP, OPK, TEVA and Cocrystal) fundamentally restructured BZNE, MSLP and Cocrystal in an extremely unusual short time span.

214. The BZNE/Cocrystal merger was not an arm's length transaction, as would be legally required by the fact that BZNE is a publically traded company and that Cocrystal was partially owned by publically traded companies (OPK and TEVA).

215. The machinations between BZNE, MSLP and CoCrystal resulted in a company (BZNE) with the CoCrystal technology and a decent amount of operating capital, all of which was raised by the sale of BZNE and MSLP stock on the open market under false pretenses (i.e., self-dealing, pumping BZNE and MSLP stock and dumping newly minted shares).

216. The machinations were done without any company filing a prospectus. Both MSLP and BZNE/COCP profited from the transactions by selling stock.


MusclePharm's Role in the 2013 BZNE Pump and Dump Fraud

217. The BZNE pump and dump scheme described above was coordinated by the Frost gang with transactions between BZNE/COCP and MSP to issue and sell shares of both companies in a fraudulent manner, as outlined below.

218. In mid to late 2013, the Frost Group exerted control over three companies that were to be involved in a coordinated fraud: privately held Cocrystal Discovery and publicly traded companies BZNE and MSLP.

219. Cocrystal was almost out of cash and had no income, no prospective investors, and no pharmaceutical products in development. However, they had credible technology and the aura of Nobel Prize winner Dr. Roger Kornberg as a founder and leader.

220.  MSLP was open to an illegal transaction that would cost them nothing except share dilution, produce net cash, expand their manufacturing capabilities, and potentially lead to new products.

221.  BZNE was facing operating deficits and a cash-flow crisis.  BZNE had abandoned or fraudulently transferred away their most important intellectual property rights and they had lost almost all new product development capabilities.  They were no longer a viable business, and they needed a new end game.

222.  In early September of 2013, MSLP "invested" $2 million in BZNE.  The "investment" was described as follows:

> "The investment was made in the form of a 10% secured convertible note due one year from the date of issuance. The note is convertible into common shares of BioZone Pharmaceuticals stock at a price of $0.20 per share. Additionally, MusclePharm received a 10-year warrant to purchase a further 10 million shares of BioZone common stock at an exercise price of $0.40 a share." (058)

223.  On or about September 27 of 2013, trading in the BZNE pump and dump began.

224.  BZNE repaid MSLP's "investment" with $1 million cash and 5 million shares of BZNE stock, which MSLP almost immediately sold for a profit.

225.  From a BZNE SEC filing :

> "Item 1.01 Entry into a Material Definitive Agreement.
> "On November 12, 2013, Biozone Pharmaceuticals, Inc. (the "Company"), Biozone Laboratories, Inc. ("Bio Lab"), Baker Cummins Corp. ("BCC") (the Company, Bio Lab and BCC are collectively referred to as "Biozone"), Brian Keller, MusclePharm Corporation ("Musclepharm") and Biozone Laboratories, Inc. ("Acquisition Co."), a newly formed subsidiary of Musclepharm, entered into an Asset Purchase Agreement (the "Agreement"). The Agreement provides that Acquisition Co. will acquire substantially all of the operating assets of Biozone including the QuSomes, HyperSorb and EquaSomes drug delivery technologies (excluding certain assets including cash on hand) for 1,200,000 shares of Musclepharm's common stock. Of the 1,200,000 shares being issued under the Agreement, (i) 600,000 of the shares will be issued to the Company upon closing and (ii) 600,000 of the shares (the "Escrowed Shares") will be placed in escrow for nine months from the date of closing (the "Escrow Period"). During the Escrow Period, Musclepharm will have the option to

43

purchase the Escrowed Shares at $10.00 per share in cash. The Escrowed Shares will also back-stop potential indemnification claims that Acquisition Co. may have under the Agreement." (059)

226. The Asset Purchase Agreement with MSLP valued BZNE at less than 25% of its then current market capitalization.

227. From a BZNE SEC filing from November 18, 2013):

"Subsequent to September 30, 2013, the Company entered into an agreement to sell its operating assets. It expects to close the sale by December 31, 2013. Upon closing, the Company will have a material stock ownership of MusclePharm Corporation ("MSLP"), cash, expects to have no liabilities and only one employee of the Company." (204)

228. From a November 27, 2013 press release (214):

"Biozone Pharmaceuticals Announces Executed Letter of Intent to Merge With Cocrystal Discovery Inc. ENGLEWOOD CLIFFS, NJ--(Marketwired - November 27, 2013) - Biozone Pharmaceuticals, Inc. (OTCBB: BZNE) today announced that it has agreed to terms and signed a Letter of Intent to merge with Cocrystal Discovery, Inc., a privately-held, biotechnology company developing antiviral therapeutics for human diseases. Cocrystal Discovery has breakthrough technologies that enable the creation of first- and best-in-class antivirals."

229. As an eventual result of these transactions, the entity of BZNE disappeared and the ticker symbol BZNE was changed to COCP.

230. As an eventual result of these transactions, MSLP sold the BZNE shares and warrants for a net profit of over $1.7 million. Buyers paid artificially inflated prices because of the pump and dump.

231. As an eventual result of these transactions, COCP profited $1 million from the sale of BZNE shares to MSLP for twenty cents each.

232. Also, COCP sold shares the MSLP stock for proceeds in the millions of dollars. These proceeds kept COCP afloat for over a year.

233. All of the BZNE/Cocrystal/MSLP/COCP transactions were dependent on the pump and dump, which resulted in a liquid market for BZNE stock.

234. Page 1 of MSLP's 2013 Form 10-K (205) states that:

"On August 26, 2013, the Company entered into a Securities Purchase Agreement with BioZone Pharmaceuticals, Inc. ("BioZone") pursuant to which the Company bought (i) $2,000,000 of a 10% secured convertible promissory note due one year from the date of issuance and (ii) a warrant to purchase 10,000,000 shares of the BioZone's common stock, at an exercise price of $0.40 per share, for $2,000,000. On October 24, 2013, the Company converted principal in the amount of $1,000,000 into 5,000,000 shares of Biozone's common stock and was repaid the remaining principal of $1,000,000 and accrued interest of $32,877 to satisfy the remaining debt. On November 25, 2013, the Company entered into a Stock Purchase Agreement with certain accredited investors (the "Purchasers") pursuant to which the Company sold warrants to purchase 10,000,000 shares of BioZone common stock to the Purchasers for an aggregate purchase price of $1,250,000. In November, the Company sold an aggregate of 5,000,000 shares of common stock in Biozone for gross proceeds $1,500,000."

235. The paragraph above describes a fraudulent transaction related to a pump and dump fraud perpetrated by BZNE/COCP and related individuals and entities. It is clear from this disclosure that MSLP reaped illegal gains of at least $1,782,877 from the fraud. Further, the "Purchasers" also reaped illegal gains.

236. To summarize, this part of the fraud scheme worked like this: MSLP made a loan of $2 million to BZNE using a secured convertible note. Shortly thereafter, BZNE repaid the load with $1 million in cash and 5 million shares of BZNE priced at 20 cents each. MSLP also received warrants to purchase 10 million shares of BZNE at 40 cents per share. MSLP then sold the shares on the open market at artificially inflated prices, and the warrants were sold to "accredited investors" at a time when they were in the money. It appears that MSLP reaped illegal gains of at least $1,782,877 from the fraud.

237. Also, COCP has sold shares the MSLP stock for proceeds in the millions of dollars. These proceeds kept COCP afloat for over a year.

238.  All of the BZNE/Cocrystal/MSLP/COCP transactions were dependent on the pump and
dump, which resulted in a liquid market for BZNE stock.

BZNE's fraudulent asset sale to MSLP

239.  The Frost gang completed the initial phase (Phase 1) of the BZNE P&D within a few
weeks.  They used their fake pharmaceutical product pipeline story to hype the company.
Insiders unloaded shares at inflated prices.  MSLP unloaded their BZNE shares and warrants and
made a profit of over $1.7 million.  However, the Frost gang still had to deal with the realities
that BZNE's finances were a disaster and BZNE's product pipeline story was fake.  This next
phase involved more insider dealing at two companies controlled by the Frost Group:  (1)
publicly traded MSLP; and (2) privately held Cocrystal Discovery, Inc.  The sale of BZNE's
manufacturing assets is described in this section.  The Cocrystal merger with BZNE is described
below in the next section.

240.  At the starting point of Phase 2 of the P&D:

(a)    BZNE was a financial disaster with no real business left after the looting and
mismanagement by the Frost gang.

(b)  Cocrystal had credible science and people, but no money, no products and extremely limited
ability to raise more capital.

(c)    MSLP was a viable candidate to take over BZNE's manufacturing business, and open to an
opportunity to raise cash illegally.

241.  In the Phase 2 transactions:

(a)  MSLP made money on the P&D.

(b)  BZNE "sold" its manufacturing assets to MSLP for MSLP stock.

46

(c) BZNE merged with CoCrystal Discovery, Inc. to become COCP.

242. At the end of Phase 2:

(a) MSLP gained some cash by diluting its shares.

(b) BZNE and its fake product pipeline story evaporated.

(c) Cocrystal (and the shell of BZNE) became COCP, with some capital (in the form of MSLP shares) and a better product development story that BZNE's completely fake story.


The BZNE/Cocrystal Reverse Merger

243. BZNE's intended merger with CoCrystal Discovery, Inc. was announced on November 26, 2013 - almost exactly two months after Phase 1 of the P&D began and less than three months after settlement of the first Fisher litigation. After the merger the company began trading under the ticker symbol COCP and market manipulation of the shares by the Frost gang continued.

244. There have been problems with COCP's SEC filings and corporate transparency. These problems are related to illegal and/or fraudulent activities and continuations of previous deceptive practices at BZNE. Like the BZNE/MSLP transactions, the numbers simply don't add up. Pederson summarized some of these problems in a letter to Kornberg dated September 9, 2014 (60) as follows:

> "It is clear from COCP's SEC filings that Teva's option on a Hepatitis C therapeutic has expired. However, the company has made no explicit public announcement of this fact. This is troubling for at least two reasons. First, the Hep C formulation is the biggest driver of COCP market valuation, and this indicates that Teva valued the Hep C formulation at less than $7.5 million. Second, (paid?) pumpers on internet message boards repeatedly comment as if the Teva option is still alive. This indicates that someone associated with the company may be colluding with the pumpers.
>
> In the Cocrystal/BZNE merger, the owners of Cocrystal got 60% of the ownership of the new company in the form of preferred stock. This preferred stock has all the voting rights of the common shares, but those preferred shares are not reported as

47

common shares outstanding and therefore are often not taken into consideration when people try to calculate market capitalization. This an issue, because with 125 million or so common shares out and the equivalent of another 210 million shares of common in the form of preferred, and with about $12 million in cash and securities plus a lead product valued by Teva at less than $7.5 million, that calculates to a share price of about six cents per share. The company has not articulated a reason why it issued or is keeping the preferred shares instead of converting them to common shares. It appears that this may be part of an effort to artificially inflate the share price in the near term.

COCP has announced that it has plans to file an IND on their Hep C formulation by the end of 2014 and then file an IND on a second product by the end of 2015. At the same time, the company has also announced that it expects its R & D expenses to remain relatively flat so that its financial reserves will last at least 12 months. This does not add up, either. Post-IND drug development requires regulatory scale-up, QA scale-up, manufacturing scale-up, and clinical testing scale-up. All these things cost money and they cannot be done on a flat budget."

## Continued pumping at COCP and the Role of Roger Kornberg

245. Roger Kornberg has a resume similarly impressive as that of Frost. Frost and Kornberg are longtime associates.

246. Kornberg was named to the COCP Board of Directors, along with Frost, in 2014 after the merger between BZNE and Cocrystal Discovery, Inc. Kornberg was a director at COCP until his resignation.

247. Kornberg received millions of shares of COCP as a result of the merger between BZNE and Cocrystal Discovery, Inc. (215)

248. On September 9, 2014, Pederson sent Kornberg a letter (Ex 060) in care of COCP's outside attorney Paul Sievers. (060)  The letter requested that Kornberg conduct an investigation into the FrostZone pump and dump.

249. Pederson then sent further letters to Kornberg in care of Sievers (216).

250. On October 3, 2014 Pederson asked Sievers by email if he had delivered the letters to Kornberg (217).  Sievers responded that he had not. (217)

251. Pederson then mailed certain of the letters directly to Kornberg at his laboratory at Stanford on October 4, 2014. (219)

252. Instead of conducting an investigation, Kornberg resigned from the COCP Board.

253. On October 23, 2014, COCP issued a press release titled, "Cocrystal Pharma Develops Novel Ebola Screening Technology." The story contained this paragraph:

> "According to Cocrystal Chief Scientist, Dr. Roger Kornberg, "We are very excited to have cloned the gene, purified and characterized its product, and integrated the gene product into our high-throughput platform. We believe we are the first group to have developed a novel screening methodology that can accurately identify inhibitors, which are potential drug candidates.""

254. David Zazoff of MDM Worldwide was listed as COCP's contact person for the press release. (220)

255. On November 20, 2014 the SEC issued an investor alert (221) and halted the trading in four stocks that were being promoted based on the ebola scare. (222)

256. COCP's ebola story was not based on a real R&D program at COCP, but was merely intended to pump up the price of COCP shares.

257. Frost gang insiders have continued to dump shares in the years following the initial 2013 P&D. For example, COCP president Sam Lee sold 2.2 M shares @ 44 cents on Dec 23, 2016. (223)


Phillip Frost memes – the "retail buyer meme"

258. The Frost gang has created (at least) two memes for Frost, one meme for retail stock buyers and another for people they draw into Frost gang operations. Best memes are based on Frost's long list of hard-earned and legitimate accomplishments and his impressive wealth. Each meme is tailored to its specific audience to produce a specific result. Both memes leave out or

misrepresent important information, and thereby are used for manipulating the market in Frost gang pump and dumps.

259. The "retail buyer meme" touts Frosts history of success as an investor. The idea is that the retail investor will succeed by buying stocks that are associated with Frost. What this meme does not say is that Frost always acquires his initial stock in a company at prices far below what retail buyers must pay. For example: Frost buys at five cents, retail buyer buys at 75 cents, stock settles at twenty cents, Frost is ahead, retail buyer is behind.

260. This meme is fundamentally misleading, but it is touted daily on message boards (224) , and also in more expanded articles (225).

The Phillip Frost memes – the "technology lure meme"

261. The Frost gang P&D scheme requires a steady flow of technology companies and "gold mines" to spin promotional stories for their pump and dumps.

262. The technology lure meme is used to convince individuals associated with technology companies to be drawn into Frost gang activities. This meme focuses on Frost's wealth and his stated ability and intention to provide investment funding. Another aspect of this meme is Frost's extensive network of high level connections and his potential ability to facilitate deals.

263. When plaintiff learned about the proposed funding of BioZone by the Frost Group, plaintiff googled the name Michael Brauser and discovered a history of litigation over business deals. When Pederson discussed his concerns over this with Keller, Keller said in effect that Frost was legit, he was worth billions, he lived on a private island and he owned an Airbus 320 airplane. Therefore, he would come through with the funding. This argument kept Pederson believing that

the Frost gang were going to provide the promised funding right up until the moment when it was absolutely clear to Pederson that the entire thing was a fraud.

264. In FrostZone, Frost's IVAX building (005) in Miami was another key part of the lure. Initial meetings took place at a conference table just outside Frost's office, where he was working. Plaintiff and other members of the BioZone team were given false confidence in the Frost gang's intention to deliver funding in part by the impressiveness of the building and the proximity to Frost. What this technology lure meme did not say is that the Frost gang did not intend to provide funding, because they had plans for BioZone as a pump and dump vehicle.

265. Defendant Phillip Frost has an impressive resume, and reportedly several billion dollars of net worth. Plaintiff initially felt honored to meet Frost, especially since Pederson believed Frost's promise for funding BioZone. During the long period when the promised funding for BZNE was "delayed," the presence of Frost in the picture gave plaintiff a belief that the funding would be delivered. When Pederson learned of the fraudulent propofol rights transfer to Opko without delivery of the eight million dollars, one of Pederson's first thoughts was, "Why would anyone with that much money do something like this?"

Pederson's resignation from the California bar

266. California Rule of Professional Conduct Rule 3-100 states

"(A) A member shall not reveal information protected from disclosure by Business and Professions Code section 6068, subdivision (e)(1) without the informed consent of the client, or as provided in paragraph (B) of this rule."

267. The sole exception to this rule under paragraph (B) is when,

"the member reasonably believes the disclosure is necessary to prevent a criminal act that the member reasonably believes is likely to result in death of, or substantial bodily harm to, an individual."

268. As a member of the California bar, this rule prohibited Plaintiff from telling Wu and Fisher what he knew about the frauds against them.

269. Pederson did legal research to see if other avenues were available under the California Rules of Professional Conduct. General Dynamics Corp. v. Superior Court (Rose) (California 1994) suggested some procedural options, but none that were practical.

270. In Minnesota, where Pederson has been a member of the state bar since 1992, the exceptions to strict confidentiality are broader under the Rules of Professional Conduct. Exceptions under paragraph (b) of Rule 1.6 include:

> • "the lawyer reasonably believes the disclosure is necessary to prevent the commission of a fraud that is reasonably certain to result in substantial injury to the financial interests or property of another and in furtherance of which the client has used or is using the lawyer's services, or to prevent the commission of a crime" (Rule 1.6(b)(4))
> • "the lawyer reasonably believes the disclosure is necessary to rectify the consequences of a client's criminal or fraudulent act in the furtherance of which the lawyer's services were used" (Rule 1.6(b)(5))
> • "the lawyer reasonably believes the disclosure is necessary to establish a claim or defense on behalf of the lawyer in an actual or potential controversy between the lawyer and the client, to establish a defense in a civil, criminal, or disciplinary proceeding against the lawyer based upon conduct in which the client was involved, or to respond in any proceeding to allegations by the client concerning the lawyer's representation of the client" (Rule 1.6(b)(8).

271. The California rules only allow an attorney to divulge client confidences when either death or mayhem is imminent. While other rules and doctrines such as the crime-fraud exception to attorney-client privilege may come into play, California lawyers are severely restricted in their ability to reveal bad acts of their clients. In comparison, the Minnesota rules allow an attorney to work for justice in many situations where such action would not be allowed under the California rules.

272. For Pederson, FrostZone brought the difference between the Minnesota and California rules came into clear contrast. What Pederson believed to be a white collar criminal gang used

fraudulent means to take control of a corporate client that he had been serving for over a decade. Representatives of the gang acting in the name of the corporation lied to Pederson for over a year in order to use his services to defraud former clients and colleagues. When Pederson became aware of one instance of fraud, it alerted him to other instances. Pederson tried to convince representatives of the corporation to rectify the frauds. When they refused, he withdrew his representation. Then, for two years he observed from a distance as the gang continued their frauds and crimes against his former colleagues and clients, as well as against the American public. The circumstances made it wrongly appear to Pederson's former clients that Pederson knowingly and willingly participated in the frauds against them. It was an agonizing experience for Pederson.

273. While he was not obligated by law to come forward, in early 2014 Pederson formally resigned from the California Bar. Once his resignation was accepted by the California Supreme Court, he contacted Fisher and Wu and told them much of what he knew.


Investigating FrostZone with Dan Fisher

274. After re-establishing contact with Fisher, Pederson and Fisher worked together to untangle the intricacies of FrostZone. A 42-page "meet and confer" letter dated July 23, 2015 which was included with plaintiff's August 14 court filing in the case of 580 Garcia Properties, LLC vs..BioZone Laboratories, Inc. et al, Superior Court of the State of California in and for the County of Contra Costa, Case No.: MSC14-00754 details many of their findings. (061)

275. Pederson discovered that many others believed that they had been cheated by the Frost gang, and that many investigations (both formal and informal) were ongoing. Especially useful publicly available documents and summaries include:

-The Placebo Effect (226)

-IDI "pumpstopper" article (227)

-Joseph Noel plea agreement (110)

-Imran Husain plea agreement (228)

-Articles by Teri Buhl (229)

-articles written by Chris Drose (230)

276. Pederson has assembled a list of companies that have shown signs of being set up as pump and dump vehicles by the Frost gang.

277. Pederson developed numerous contacts in the federal government to report on FrostZone, including individual contacts at the FBI, SEC and U.S. Attorney's Office. (120, 233)


RICO

278. Plaintiff reserves the right to amend this complaint to include RICO claims against Frost and Does 1-50 as those claims become ripe under federal law.


Summary

279. The fraudulent acts of the Frost gang are a tangled mess. However, some simple points are clear.

280. The Frost gang, including defendant Frost, formed a conspiracy to conduct a pump and dump securities fraud at BioZone/BZNE. This conspiracy harmed investors nationwide, as well as hurting Plaintiff Pederson, who was manipulated by members of the gang while working from his office in Minnesota.

281. The Frost gang fraudulently took over BioZone by not following through on their obligations under a Binding Letter of Intent. This led to the departure of Dan Fisher from BZNE.

282. The Frost gang looted the assets of BZNE, including the transfer of rights to a potential billion dollar propofol formulation to OPK. This led to the departure of both Nian Wu and Lee Pederson from BZNE.

283. The Frost gang damaged BioZone's manufacturing business, destroyed BioZone's R&D programs and business development activities, and hurt many people financially.

284. The main goal of the Frost gang was to illegally profit from a pump and dump stock fraud, which has made them tens of millions of dollars.

285. In the process of carrying out the pump and dump, defendants harmed Plaintiff along with many other people.


Damages

286. Defendants and their agents and associates lied to and manipulated plaintiff for over a year as part of a criminal securities fraud. By the time that plaintiff began to realize that he was the victim of a fraudulent scheme, it was too late to undo much of the damage.

287. As a result of the actions of the defendants, Plaintiff has had to spend more than 10,000 hours investigating the Frost gang and the events involved in the FrostZone crimes and frauds. At $240/hour, Plaintiff has lost more than $2.4 million dollars in income that he otherwise would have earned.

288. As a result of the actions of the defendants, Plaintiff has suffered harm to his reputation.

289. As a result of the fraudulent actions of the defendants, Pederson has suffered financial losses from zeroing out fees and expenses for services rendered to Nian Wu.

290. As a result of the fraudulent actions of the defendants, Pederson has suffered financial losses from non-payment by BZNE for services rendered to BZNE.

291. As a result of the actions of the defendants, Plaintiff has been forced to resign from the California bar.

292. Plaintiff reserves the right to amend this complaint to include claims for punitive damages.


FIRST CLAIM FOR RELIEF - FRAUD

293. Plaintiff Pederson re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1 - 292 into this First Claim for Relief as if fully set forth herein.

294. One aspect of the multifaceted fraud outlined in paragraph 1 to 112 is a fraud against Plaintiff Pederson.

295. Unknown to Plaintiff, Keller began to mislead and lie to plaintiff in early 2011. Keller represented to Pederson that (a) Frost and others would provide the promised funding; (b) the funding would be used to support Wu's research and the Kilo Lab.

296. As represented by Keller to Pederson, one essential component of the promised funding activity was for Wu to execute documents conveying Wu's interest in the Wu Technology to BZNE. Wu had grown suspicious of Frost, Maza and even Keller, so plaintiff's influence was needed to convince Wu to sign the document (the First Wu License).

297. In reliance of Keller's false representation, plaintiff put his professional and relationship and personal reputation with Wu on the line to urge Wu to sign the first Wu License. Largely as

56

a result of plaintiff's assurances to Wu, Wu signed the First Wu License in favor of BZNE in about June of 2011.

298. Keller continued to misrepresent to Pederson that the promised funding from Frost and others would materialize.

299. In reliance on these misrepresentations, Pederson began to execute a world-wide patent strategy for the Wu Technology. The strategy included Pederson engaging a network of patent practitioners in various countries around the world on behalf of BZNE. None of the practitioners required advance retainers, in part because of Pederson's involvement. When the initial fraud collapsed and BZNE ran out of money, BZNE did not pay the practitioners. As a result, Pederson's professional reputation has been damaged.

300. In late 2011 and with the consent of BZNE, Pederson was hired by Wu to draft a patent application outside the rights of BZNE. Wu was growing increasingly frustrated by the lack of funding, and Keller had been using Pederson's influence with Wu to try to keep things together, including repeating assurances that the promised funding would be forthcoming. Wu fired Pederson in January of 2012, largely because Pederson's credibility suffered from the actions of Keller and Maza and the non-performance of Frost's promise to provide funding. Keller continued to assure Pederson that the funding would come through, and that Pederson would be able to repair the damage to his relationship with Wu after the funding was obtained.

301. In early 2012, Maza and Keller represented to Pederson that one last document (the Second Wu License) was needed from Wu in order to complete the funding.

302. In reliance on the defendants' misrepresentations, Pederson assisted in the preparation of the Second Wu License.

303. Without Pederson's knowledge, Pederson's services were used by the Fraud Defendants to perpetrate a fraud.

304. After the Second Wu License was complete, Maza licensed BZNE's rights to the Wu Technology to defendant Opko for grossly inadequate consideration.

305. The Wu Technology was worth many millions of dollars and represented BZNE's greatest asset.

306. With the Opko license in place, it became impossible for BZNE to raise significant new funding from any source.

307. When plaintiff learned of the Opko license, he demanded an explanation from Maza and Keller regarding any possible business explanation for the transaction. No reasonable explanation was forthcoming. Pederson and Keller had numerous phone calls openly discussing what was by now clearly a fraud. However, Keller continued to mislead Pederson about what was going regarding the management and control of BZNE.

308. Unable to continue representing BZNE as a result of the fraud and mismanagement leading to the fraud, Pederson notified Keller that Pederson was withdrawing as of June 1, 2012. Before that date Pederson provided a detailed email and memo for Keller and Prego-Novo outlining the fraud and urging them to take corrective action. Pederson transferred all BZNE's files to BZNE's new patent attorney in early June.

309. As a direct result the fraud, BZNE struggled financially. One consequence is that BZNE was repeatedly been late with payments for services by international patent attorneys who were contracted by Pederson for the benefit of BZNE.

310. Plaintiff has been damaged by the actions of the Fraud Defendants in perpetrating the fraud, including damage to business relationships, damage to professional reputation, loss of out-

58

of-pocket expenses from the representation of Wu, and non-payment for services rendered by
BZNE.

311. All the Fraud defendants have acted as agents for one another and co-conspirators in
connection with the wrongful acts alleged in this complaint, and the acts and statements by one
are attributable to all.

312. As a result of the fraud, Pederson has had to spend thousands of uncompensated hours
trying to decipher the hidden details of the frauds in an effort to obtain justice for Fisher, Wu and
himself.

313. As a result of the fraud, Pederson has suffered severe emotional distress.

314. As a result of the fraud, Pederson's reputation has been damaged.

315. As a result of the fraud, Pederson has lost income that he would have otherwise earned.

316. The Fraud Defendants have acted in concert in various combinations, forming a group of
persons associated together for the common purpose of defrauding BZNE's shareholders and
owners, and looting BZNE's valuable intellectual property for the benefit of defendants. The
actions of the Fraud Defendants in perpetrating the fraud were the proximate cause of damages
to Plaintiff, and each of them are jointly and severally liable for these damages.


WHEREFORE, plaintiff prays for relief as set forth below.


SECOND CLAIM FOR RELIEF

TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE

317. Plaintiff Pederson re-alleges and incorporates by reference each and every allegation set
forth in paragraphs 1 - 316 into this Second Claim for Relief as if fully set forth herein.

318. In early 2012, Frost's company Opko had limited revenues and a burn rate that necessitated additional funding within a year.

319. Throughout 2012, Opko was seeking such additional funding.

320. Frost recognized the value of the Wu technology, and designed to have it transferred to Opko without paying BZNE adequate consideration.

321. Frost and Opko forced the fraudulent transfer of the Wu Technology from BZNE to Opko by exerting influence on co-conspirators Maza, Keller and Prego-Novo.

322. The fraudulent transfer was intended to improve Opko's prospects for attracting funding for the benefit of Frost and Opko.

323. The fraud was perpetrated for the benefit of Frost and Opko.

324. Pederson and BioZone had a long and mutually beneficial relationship until early in 2011. Based on the existing relationship, Keller's promises to Pederson of continued and increasing employment, and BZNE's need for Pederson's highly specialized skills and experience, Pederson had a reasonable expectation of indefinitely continued employment with BZNE.

325. In reliance on Keller's statements and promises, Pederson arranged his life to be fully available to do full-time work for BZNE once the promised funding came through. As a consequence, Pederson forwent other business and professional opportunities.

326. The tortious interference including the fraud made it impossible for Pederson to ethically continue to represent BZNE. As a result, plaintiff was compelled to withdraw from such representation.

327. If not for the tortious interference including the fraud, BZNE would have pursued its long-standing business plan and BZNE would have had more than a full-time need for services of the type Pederson provided.

328. If not for the tortious interference including the fraud, BZNE would have pursued its long-standing business plan and Pederson would have been employed by BZNE full-time (2,000 hours per year) at a rate of at least $240/hour for an indefinite number of years.

329. As a result of the tortious interference, Pederson lost at least $2.4 million in compensation.

330. As a result of the fraud and tortious interference, Pederson has had to spend thousands of uncompensated hours trying to decipher the hidden details of the fraud in an effort to obtain justice for Fisher, Wu and himself.

331. As a result of the tortious interference, Pederson has suffered severe emotional distress.

332. Frost and Opko and Keller have acted in concert for the common purpose of defrauding BZNE's shareholders and owners, and looting BZNE's valuable intellectual property for the benefit of defendants. The actions of the defendants in perpetrating the fraud and the tortious interference were the proximate cause of damages to Plaintiff, and each of them are jointly and severally liable for these damages.

WHEREFORE, Plaintiff demands judgment against the defendants as follows:

333. An award of compensatory damages in the amount of $ 2,400,000.00 (two million four hundred thousand dollars;

334. An award of further compensatory damages on the First and Second Claims for relief according to proof, as provided under law; and

335. Such other and further relief as the Court may deem just and proper.

Signature of Plaintiff _____

Lee Pederson - pro se

Minnesota attorney license no. 225605

Mailing Address        2126 Lyndale Ave S  #6

                       Minneapolis, MN  55405

Telephone Number    953-836-7949

## VERIFICATION AND ACKNOWLEDGEMENT

A. I have read this document. To the best of my knowledge, information the information, contained in the document is well grounded in fact and is warranted by existing law.

B. I have not been determined by any court in Minnesota or in any other State to be a frivolous litigant or subject to an Order precluding me from serving and filing this document.

C. I am not serving or filing this document for any improper purpose, such as to harass the other party or to cause delay or needless increase in the cost of litigation or to commit a fraud on the Court.

D. I understand that if I am not telling the truth or if I am misleading the court or if I am serving of filing this document for any improper purpose, the court can order me to pay money to the other party, including reasonable expenses incurred by the other party because of the serving of filing of this document such as court costs, and reasonable attorneys' fees.

Plaintiff's Signature

Name                    Lee Michael Pederson
                        Pro se
MN Atty. No.            225605
Address                 2126 Lyndale Ave S  #6
City/State/Zip          Minneapolis, MN  55405
Telephone               952-836-7949

SUBSCRIBED AND SWORN TO BEFORE ME
THIS 27 DAY OF OCTOBER, 2017

NOTARY PUBLIC/COURT CLERK

ELIZABETH A GLEIN
NOTARY PUBLIC - MINNESOTA
My Commission Expires Jan. 31 2022

MY COMMISSION EXPIRES
01/31/2022

63

Appendix 1 - Flow Chart



FROSTZONE    FLOWCHART

Appendix 2 - Time Line

| year | date | event |
|------|------|-------|
|      |      |       |
| 1989 |      | Fisher and Keller start BioZone Laboratories |
| 2000 |      | Pederson begins writing patents for BioZone |
| 2007 |      | Pederson begins representing BioZone as a sole practitioner |
| 2007 |      | Keller and Wu begin scientific collaboration |
| 2011 | February | Meeting in Miami with the Frost gang |
|      |      | BioZone becomes BZNE |
|      | June 22 | Meeting in New Jersey for first Wu license |
| 2012 | December | Propofol investor presentation |
|      | Jan - Feb | Fisher fired from BZNE |
|      | Feb | Press release announcing propofol license from BZNE to OPK |
|      | March 18 | Email to Keller requesting explanation |
|      | March 28 | Email to Keller re fraud |
|      | April 12 | Email to Keller re Pederson withdrawing from representation |
|      | May 11 | Fraud memo - version 1 |
|      | May 16 | Fraud memo - version 2 |
|      | June 5 | Email to Wu and Keller re abandonment of pure-PEG patent |
| 2013 | Sept 11 | Fisher settlement |
|      | Sept 26 | Misleading John Ford article |
|      | Sept 27 | BZNE P&D begins |

|      | Oct 4   | Form 144 for sale of Frost shares                |
|------|---------|--------------------------------------------------|
|      | Oct 8   | Form 144 for sale of OPK shares                  |
|      | Dec 18  | Pederson files first SEC whistleblower complaint |
| 2014 |         | Pederson resigns from Cal bar                    |
|      | June 24 | Pederson email to Wu and Keller                  |
|      | Sept 9  | First Pederson letter to Kornberg                |
|      | Nov 22  | Kornberg resigns from BZNE BOD                   |